567 P.2d 62

**Kathleen J. THOMPSON,
Plaintiff-Appellant,**

v.

**OCCIDENTAL LIFE INSURANCE COMPANY OF CALIFORNIA and Robert K. Foster, Defendants-Appellees.**

No. 2765.

Court of Appeals of New Mexico.

June 28, 1977.

Thomas J. Dunn, Nordhaus, Moses & Dunn, Albuquerque, for appellant.

William A. Sloan and Kenneth R. Brandt, Rodey, Dickason, Sloan, Akin & Robb, P. A., Albuquerque, for appellee Occidental.

Ruth Milne Schifani and Joseph E. Roehl, Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, for appellee Foster.

## OPINION

HERNANDEZ, Judge.

Plaintiff sued the defendant, Occidental Life Insurance Company of California, Inc.

(Occidental) to recover a part of an insurance premium paid on a policy of life insurance owned by her on the life of her deceased husband. Plaintiff's claim against the defendant, Robert K. Foster (Foster) was that he (the agent who sold the policy) negligently failed to advise her that it was Occidental's position that the policy did not provide for a refund of any part of the premium should the insured die prior to the end of the premium period.

Defendants' motions for summary judgment were granted and plaintiff appeals both judgments, alleging two points of error.

The pertinent facts are these: Occidental issued the subject life insurance policy on February 11, 1960, in the face amount of $130,000.00. The insured was the husband of the plaintiff and she was the owner. The paragraph relating to premiums provided:

> "Premiums are payable in advance from the policy date during the life of the Insured. If a part of the premium ceases to be payable under the provisions of an attached rider, the premium shall then be reduced accordingly. The mode of premium payment may be changed on any policy anniversary to any other mode for which a premium is shown in the policy data. All premiums are payable at the Home Office of the Company or to an authorized agent or cashier of the Company, but only in exchange for an official receipt signed by the President or Secretary and counter signed by the person receiving the payment. If any premium remains unpaid after the grace period, this policy shall terminate subject to the non-forfeiture provisions."

The mode of payment of the premiums of the policy was changed three times after its issuance, in 1964 and 1970 and on February 11, 1974. On the latter date the mode of payment was changed from monthly to annual payments and the premium of $6,014.70 was paid. Plaintiff's husband died on May 9, 1974.

Plaintiff contends that the trial court erred in granting Occidental's motion for summary judgment because there is an ambiguity in the paragraph of the policy relative to premiums and that consequently there was an issue of fact as to its interpretation. We do not agree. An insurance policy is a contract and is generally governed by the law of contracts, and the rights and duties of the parties are to be determined by its terms. *Vargas v. Pacific National Life Assurance Company*, 79 N.M. 152, 441 P.2d 50 (1968). Should there exist an ambiguity in any of its terms a liberal construction favorable to the insured is to be adopted. *Vargas*, supra. However, the determination as to whether an ambiguity exists is one of law to be made by the court. *Vargas*. Plaintiff argues that the paragraph relating to premiums "does not state that the unearned premium will be refunded nor does the provision state that the unearned premium will not be refunded." We find no ambiguity in the provisions of this paragraph. What the plaintiff would have us do, under the guise of construction, is to read into it terms it does not contain. It is not within the province of the courts to write a new contract for the parties. Absent any ambiguity, our duty is confined to interpreting the contract which they made for themselves. *Davies v. Boyd*, 73 N.M. 85, 385 P.2d 950 (1963).

As to the question of whether the plaintiff was entitled to a refund of a part of the premium paid, the rule is that:

> "In the absence of statutory or contract provision to the contrary, if a legal risk has once attached or commenced, there can be no apportionment or return afterward of the premium, so far as that particular risk is concerned. And diminution in its duration has no effect to decrease the amount stipulated as the premium or price for renewing the risk, for it is sufficient to preclude a return that the insurer has been liable for any period, however short." 6 Couch Cyclopedia of Insurance Law § 34:9 (2d ed., R. Anderson, 1961). See *Sil-Turn Co. v. London Guaranty & Acc. Co.*, 153 Misc. 805, 276 N.Y.S. 412 (1934).

There being no statutory or contract provision for a refund in this instance, the plaintiff was not entitled to one. The trial court did not err in granting Occidental's motion for summary judgment.

Plaintiff contends that the trial court erred in granting the defendant Foster's motion for summary judgment because he had negligently misrepresented to plaintiff Occidental's position that they would not refund any part of the premium after her husband's death. Plaintiff argues that Foster had a duty to advise her "that if she paid the premium on an annual basis that Occidental would not refund any portion of the premium after her husband's death." Plaintiff in answer to an interrogatory concerning Foster's negligent failure to advise her about the question of refunds stated: "Specifically in February 1972, I consulted with Mr. Foster relative to changing from monthly to annual payments, asking him the amount of discount, if any, for such change." She went on to say that Mr. Foster was well aware of the precarious state of her husband's health and that he was 70 years of age. She concluded by saying, "Mr. Foster must have realized this was an inadvisable change and should have so advised me." In an affidavit filed in support of his motion for summary judgment, after setting forth the times that the mode of payment of premiums was changed by plaintiff, Foster stated "[n]one of said changes were made at the suggestion nor insistence of the affiant."

■ "In the absence of special circumstances, an agent of the insurer is clearly not the agent of the insured." *Volker v. Connecticut Fire Ins. Co.*, 22 N.J.Super. 314, 91 A.2d 883, 889 (1952). Section 58–5–28, N.M.S.A.1953 (Repl. Vol. 8, pt. 2) provides in part:

"Any person licensed as an agent to represent an insurance company shall, in any controversy between the insured or his beneficiary and the company, be held to be the agent of the company issuing the insurance solicited or applied for, anything in the application or the policy to the contrary notwithstanding . . . ."

Our Supreme Court has held:

"[A]n applicant for insurance who accepts a policy, the provisions of which are plain, clear and free from all ambiguity, is chargeable with knowledge of its terms and legal effect. It is the duty of the assured to read and know the contents of the policy before he accepts it, and where he fails or neglects to do so, he is estopped from denying knowledge of its terms and conditions, unless he alleges and proves that he was induced not to read the same by some trick or fraud of the other party." *Porter v. Butte Farmers Mutual Insurance Company*, 68 N.M. 175, 360 P.2d 372, 375 (1961).

■ Plaintiff cites us to several cases, none of which is applicable in that they involved instances of misrepresentation. Plaintiff cites no authority in support of her contention that Foster negligently failed to advise her that it was Occidental's position that the policy did not provide for a refund of any part of the premium. Foster was not plaintiff's agent. There are circumstances where an insurance agent will be considered the agent of the insured but this is not one of them. See *Inland Empire Ins. Co. v. Bair*, 246 F.2d 505 (10th Cir. 1957). We know of no authority which holds that in circumstances such as this an insurance agent owes a duty to advise the insured. Quite the contrary, there is authority that: "Interpreting contracts of insurance is not within the scope of authority of a soliciting agent . . . ." *Union Life Ins. Co. v. Burk*, 169 F.2d 235 (10th Cir. 1948). The record reveals that the plaintiff is possessed of considerable business experience and clearly the estoppel provided for in *Porter*, supra, does apply in this instance. The trial court correctly granted Foster's motion for summary judgment.

IT IS SO ORDERED.

LOPEZ, J., concurs.

SUTIN, J. (concurring in part, dissenting in part).

SUTIN, Judge (concurring in part and dissenting in part).

*I dissent as to Occidental and concur as to Foster.*

Judges and lawyers often read insurance policies with antagonistic eyes, especially where an ordinary policyholder and the family are involved, and benefits are denied. This view arises from a history of insurance policies carefully prepared by an insurance company and for an insurance company for the protection of an insurance company. "The deceptive practices of many insurers, the evils resulting from the complex, confused, and misleading provisions inserted in various policies issued by different insurers covering the same kinds of risks prompted State legislatures to act." 1 Richards on Insurance § 12 (5th ed. by Freedman, 1952). It required the legislature and judicial decisions to modify this contract to protect the rights of an insured and his family. The insurance company always stood as strong and firm as the "Rock of Gibraltar." The insured stood by the rock as a weak and limp piece of plastic clay in contrast. The legislature and the courts have not yet met the entire challenge of the insurance contract vis-a-vis the family.

There yet remain two areas which have been covered in some respects by the judiciary and not the legislature: (1) the duty of the insured to read and understand the complex, complicated and intricate provisions of an insurance policy, the language of which ambles along the way in pedantic insurance methodology, and (2) the application of the doctrine of "reasonable expectations."

In *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 540, 64 S.Ct. 1162, 1167, 88 L.Ed. 1440, 1450 (1944), Justice Black said over 30 years ago:

Perhaps no modern commercial enterprise directly affects so many persons in all walks of life as does the insurance business. Insurance touches the home, the family, and the occupation or the business of almost every person in the United States.

The salesmanship of the insurance agent convinces average persons that insurance is a necessity in every family. What the ordinary policyholder does not know and is not taught are the provisions of the policy, the rights and duties that flow from these provisions, and the law that protects the insurer and not the insured. The insured does not seek legal advice to determine what constitutes insurance coverage and what rights are determined when a fortuitous event occurs.

The insurance contract is a one-way street. It does not fall within the category of ordinary contracts that travel along a two-way street. Ordinary contracts are prepared by attorneys. These contracts are analyzed and discussed, amended and modified before they are signed by the parties to protect each of the rights of the parties and impose reciprocal duties. Judge Learned Hand succinctly described the difference in *Gaunt v. John Hancock Mut. Life Ins. Co.*, 160 F.2d 599, 602 (2d Cir. 1947):

. . . [T]he canon contra proferentem [against the party who proffers or puts forward a thing] is more rigorously applied in insurance than in other contracts, in recognition of the difference between the parties in their acquaintance with the subject matter.

The insurance contract is carefully prepared by the insurance company with over two centuries of experience. The insured is a neophyte. He does not have the intellectual equipment to meet the challenge. Under these circumstances, the law, if it is to meet the needs of the family in the last quarter of the 20th century, must adapt itself to those needs. The law must cease to embody a philosophy opposed to change. It must become avowedly pragmatic. The first step in the administration of justice is the recognition that man is not made for the law, but that law is made for the man. Frank, Law and the Modern Mind at 252 (1936).

It has long been recognized that psychological factors, biases and prejudices, economic and social factors, and the unconscious state of mind of judges all play an essential role in the determination of change in the law. These factors have influenced my judgment. And it is wise that change comes slowly with the passage of time.

Our Supreme Court has followed the philosophy of change in the last few years. It abolished sovereign immunity. *Hicks v. State,* 88 N.M. 588, 544 P.2d 1153 (1975). It declared the "guest statute" unconstitutional. *McGeehan v. Bunch,* 88 N.M. 308, 540 P.2d 238 (1975). It adopted the "reasonable expectations" doctrine in insurance law. *Pribble v. Aetna Life Insurance Company,* 84 N.M. 211, 501 P.2d 255 (1972). It abolished the defense of "unavoidable accident," *Alexander v. Delgado,* 84 N.M. 717, 507 P.2d 778 (1973), and "assumption of risk" as a defense in tort law, *Williamson v. Smith,* 83 N.M. 336, 491 P.2d 1147 (1971), and it adopted the doctrine of strict tort liability. *Stang v. Hertz Corporation,* 83 N.M. 730, 497 P.2d 732 (1972).

In New Mexico, we have always interpreted insurance contracts with great liberality to protect the insured. *Read v. Western Farm Bur. Mut. Ins. Co.,* 90 N.M. 369, 563 P.2d 1162 (Ct.App.1977). We no longer require every insured to read and understand the terms of the contract. We have adopted the doctrine of "reasonable expectations." *Pribble,* supra; *Read,* supra.

To arrive at a decision in this case, I leave the pathways by which opposing attorneys have sought a solution to the problem in this case.

Is a beneficiary of an ordinary life insurance policy, under which an annual premium has been paid by the insured, entitled to a pro rata refund of a portion of the premium paid, when, thereafter, the insured dies during the year?

This is a new and novel question in New Mexico.

Plaintiff was the owner and beneficiary of defendant Occidental's life insurance policy, which policy insured the life of her husband. On February 11, 1974, plaintiff paid the annual premium in the amount of $6,209.70 and on May 9, 1974, her husband died. Defendant paid the amount admittedly owing, but it refused to refund approximately three-fourths of the premium paid, $4,657.26, which amount represents a pro rata refund. Defendants were well aware of the precarious state of her hus-

band's health. They knew that the Thompsons had sold their business due to Mr. Thompson's prolonged illness of several years. If plaintiff had been aware of Occidental's undisclosed rule that the advanced payment would penalize her, that no refund would be made, she would not have changed from a monthly to an annual premium, and would not have paid such a large amount in advance. Plaintiff had consulted with defendant Foster, Occidental's agent, relative to changing from monthly to annual payments to determine the amount of discount, if any, for such a change. Under the monthly payment plan, the policy provided:

> Any unpaid premiums or instalments required to complete the premium payments for the policy year in which death occurs, will be deducted in any settlement hereunder.

In the annual premium policy in question no such provision was contained therein. Plaintiff's husband died at around the age of 70 years. When she requested the refund she was advised by defendant Foster that she had saved $78.00 a year which would take about 60 years to result in a saving of $4,657.26, the pro rata amount she believed was due her.

We are not involved with any ambiguity in the language of the policy. It was silent on the right of an insured to a refund. We cannot say that the "Payment of Premiums" provision is doubtful or uncertain, speculative or open to question. We are confronted with the old proverb that "Good words are silver, silence is golden." An insurer believes that the premium language in its policy is silver, and its silence on refund is golden. I am unable mentally to apply this proverb favorably in insurance contracts in view of the status of the parties. The insurer has a duty to speak or disclose. Otherwise, it is bound by the doctrine of "reasonable expectations" of the insured.

Wilbur M. Bolton, Associate Actuary of Occidental, by affidavit, stated:

The practice of refunding premiums for some part or all of the period beyond the date of death varies with different insurance companies. Some companies do make such refunds either because the insurance contract requires it or because through action by the Company's Board of Directors an apportionment of the company's surplus funds has been made to provide such refunds to the beneficiaries of those insureds whose death occurs after the date on which this action by the Board of Directors becomes effective. *Other companies, including Occidental Life Insurance Company of California, do not make such refunds nor provide for such refunds by the insurance contract. In the absence of such a contractual requirement, no such action to appropriate the company's surplus funds has been made by the Board of Directors.*

\* \* \* \* \* \*

. . . In practice, therefore, a company which refunds premium paid beyond the date or month of death, will charge a higher rate for life insurance than another company which does not refund premiums . . . .. *In the absence of a state law and regulation requiring that such benefits be provided by all life companies, it is proper for a life insurance company to follow a practice of refunding premiums beyond death and charging a higher rate therefor or a practice of not refunding such premiums and charging a lower rate as is the practice of Occidental Life Insurance Company.* [Emphasis added.]

Mr. Bolton's statement is fair and clear. It is a simple explanation of the rules under which an insurance company determines the payment or non-payment of premium refunds. My quarrel with Occidental is also fair and clear.

Occidental relies on the old established rule stated in 6 Couch on Insurance 2d § 34:9 (1961):

In the absence of statutory or contract provision to the contrary, if a legal risk has once attached or commenced, there can be no apportionment or return afterward of the premium, so far as that particular risk is concerned.

This rule of law is also stated in 44 C.J.S. Insurance § 406 (1945); 43 Am.Jur.2d, Insurance, § 629 (1969). To my knowledge, no case involves an action to recover a refund after the insured has died, and very few of the cases involve an ordinary life insurance policy with an ordinary family beneficiary, and all of them precede the doctrine of "reasonable expectations."

Occidental also relies upon the doctrine that where an insured dies on the due date of the premium, the insurer can deduct the amount of the annual premium for the ensuing year. *Long v. Pilot Life Insurance Company,* 250 N.C. 590, 108 S.E.2d 840 (1959); *Callahan v. John Hancock Mutual Life Insurance Co.,* 331 Mass. 552, 120 N.E.2d 640 (1954), 45 A.L.R.2d 1262 (1956), and cases cited in the annotation.

In these cases, the policy provides that the amount of insurance due would be paid on the death of the insured "less any unpaid balance or premium for the uncompleted policy year." The irrelevance of this rule is obvious. The difference between an "unpaid" premium with a policy provision for deduction and a "paid" premium with silence in the policy as to a refund is the difference between black and white. Occidental seeks to beat the plaintiff black and blue. It raises the "black flag," one that used to be hoisted over a prison immediately after an execution. To me, no execution of plaintiff has occurred.

The ordinary beneficiary, the plaintiff in this case, has no knowledge of this rule of law. My quarrel with Occidental arises out of the answer to this question: Why did Occidental refrain from stating in bold face type in its policy: "OCCIDENTAL DOES NOT MAKE REFUNDS OF INSURANCE PREMIUMS UNDER THIS POLICY."? or "Why does your agent refrain from notifying the insured that no refunds of premiums will be made under the terms of this policy?" or "Why do you keep this rule of law a secret from your insured?"

An insured relies upon the language of the policy or the language of the agent.

The insured never sees his policy until after he has paid his premium and the contract is formed and presented to him. The policy is then placed in a drawer to await death with hope and confidence that his family will be protected and no controversy will arise. No longer is the insured a witness.

Under these circumstances, it is normal and rational for judges to return to the ancient maxims by which justice is determined. Heretofore, it has not been done. We ascertain justice by natural reason or ethical insight, independent of the formulated body of law. We call it "equity," and we say that "Equity delights to do justice and that not by halves," or "Equity looks upon that as done which ought to have been done," or "Equity suffers not a right without a remedy." I simply call all of these maxims a search for "fair play" in the social and business relationships of our society.

The doctrine of "reasonable expectations" is an equitable approach to a solution of this controversy. By this doctrine we mean that the insured is the "Rock of Gibraltar;" that the insurance policy will yield the maximum of protection to, and the reasonable expectation of, the insured; that the insurer will not be permitted to take an unconscionable advantage.

Thus far, we have related the doctrine to ambiguities in the language of the policy. *Read, supra; Pribble, supra.* This doctrine has been extended beyond the ambiguity problem.

The basis for this extended version of the doctrine is to fulfill the insured's objectively reasonable expectation even though the policy excludes coverage for the particular loss sustained. Milstein, Contracts—Insurance Law—Theories of Unconscionability, etc., 64 Georgetown L.J. 987 (1976); Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 Harvard L.Rev. 961 (1970). Professor Keeton states the rule as follows:

The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations. [at p. 967.]

This is the direction in which insurance law appears to be moving and Professor Keeton submits that it is also "a principle that insurance law ought to embrace."

In *Corgatelli v. Globe Life & Accident Insurance Co.*, 96 Idaho 616, 533 P.2d 737 (1975), Idaho adopted the "doctrine of reasonable expectations." Under the insurance policy, payment was allowed "For Complete Dislocation of: . . . Collar Bone". A collar bone cannot be dislocated, but the court allowed recovery for dislocation of the shoulder joint. The court said:

The doctrine of reasonable expectations is peculiarly applicable to contracts where as here it is drawn in such a fashion that one hand steals away what the other seemingly confers. A close analysis of the literal meaning of the words in the provision in question solves none of the problems since the literal language is at odds with the reasonable expectations an insured would obtain from the contract. [533 P.2d at 741–42.]

In *Paramount Prop. Co. v. Transamerica Title Ins. Co.*, 1 Cal.3d 562, 83 Cal.Rptr. 394, 463 P.2d 746 (1970), a "Payment of Loss" provision provided that " '. . . [p]ayment in full by any person . . . of a mortgage covered by this policy shall terminate all liability of the [title] Company to the insured owner of the indebtedness secured by such mortgage, * * *'" Even though "payment" was allegedly made under duress, and the payor sought recovery in court, the court held that the "payment" did not terminate coverage of the policy. Why? Because "[n]o language preceded this last sentence [*supra*] to warn the policyholder that it did not involve payment of loss but *non*-payment of loss." [83 Cal. Rptr. at 396, 463 P.2d at 748.] The court said:

If "full payment" is interpreted to apply to a payment which does not eliminate the insured's risk, then the provision irrationally ties the termination of the policy to an arbitrary and fortuitous occurrence. We do not think such an interpretation is

in accord with the reasonable expectations of the parties. [83 Cal.Rptr. at 398, 463 P.2d at 750.]

In New Jersey, a homeowner's policy was held to include workmen's compensation insurance even though many pages later, it was specifically excluded. Reasonable expectation means that an insurance company is bound by the impression that the average insured would gain from such inspection of the policy as he would be likely to make. *Caldwell v. Aetna Casualty and Surety Company,* 107 N.J.Super. 456, 258 A.2d 900 (1969), 41 A.L.R.3d 1300 (1972); *Gerhardt v. Continental Ins. Cos.,* 48 N.J. 291, 225 A.2d 328 (1966).

Public policy and "fair play" dictate that we read into the policy in bold face type:

The objectively reasonable expectations that you have regarding the terms of this policy will be honored,

A question of fact exists whether plaintiff had reasonable expectations that a pro rata refund of the premium paid would be made.

Occidental argues that plaintiff's claim is barred by an accord and satisfaction. This is an affirmative defense. Section 21–1–1(8)(c), N.M.S.A.1953 (Repl. Vol. 4, 1975 Supp.). It was not pleaded as an affirmative defense or raised as an issue in the trial court. Issues not properly raised in the trial court and on which a ruling of the trial court was not properly invoked will not be considered on appeal. *In Re Will of Skarda,* 88 N.M. 130, 537 P.2d 1392 (1975). Neither can it be raised for the first time on appeal. *Western Cas. and Sur. Co. v. City of Santa Fe,* 84 N.M. 409, 504 P.2d 17 (1972).

Plaintiff sued Foster as a duly authorized agent of Occidental acting within the scope of his authority and employment; that as an authorized agent, in handling the account of plaintiff, he "should have advised said customer of the company's application and interpretation of the policy provisions, and his negligent failure to so advise Plaintiff of facts which he knew or should have known Plaintiff would rely upon, and upon which Plaintiff did rely, caused Plaintiff damages in the amount of $4,657.26. . . . Plaintiff is entitled to damages based on the negligent misrepresentations of the Defendant Robert K. Foster . . . .' "

Plaintiff seeks to pole vault to damages without a pole. An action for negligent misrepresentations is an action upon which relief can be granted. It is a tort determined by the general principles of the law of negligence. To sustain the action, the breach of a legal duty must occur. *Maxey v. Quintana,* 84 N.M. 38, 499 P.2d 356 (Ct. App.1972).

*First,* plaintiff says:

"Foster had a duty to advise Thompson that if she paid the premium on an annual basis that Occidental would not refund any portion of the premium after her husband's death."

Did Foster have a duty to advise? Plaintiff relies on *Barber's Super Markets, Inc. v. Stryker,* 84 N.M. 181, 500 P.2d 1304 (Ct. App.1972). This case involved a fiduciary relationship between a purchaser and a broker. A licensed insurance agent is an agent of the company issuing the insurance solicited. Section 58–5–28, N.M.S.A.1953 (Repl. Vol. 8, pt. 2). No fiduciary relationship existed between Foster and plaintiff.

Thus far, no authority can be found, and none has been cited, that upon inquiry by an insured with reference to a change in premium payments, an insurance agent has a legal duty to advise an insured of the company's application and interpretation of the policy's provisions on the pro rata refund of an annual premium. We have consistently held that whether a duty exists, the breach of which gives rise to liability for negligence, is a pure question of law for determination by the court. *Southern Union Gas Co. v. Briner Rust Proofing Co.,* 65 N.M. 32, 331 P.2d 531 (1958).

Upon what legal basis did Foster have a duty to advise?

A "legal duty" is defined in 28 C.J.S. "Duty" at 597 (1941) as follows:

The term implies the existence of some relation of duty, public or private, special or general, either by contract or as an implication of public policy; and has been defined as an obligation arising from contract of the parties or the operation of law; that which the law requires to be done or forborne to a determinate person or to the public at large, and is correlative to a right vested in such determinate person or in the public.

It has also been said that a legal duty implies the existence of some legal relation. *Early v. Houser & Houser,* 28 Ga.App. 24, 109 S.E. 914 (1921).

There was no fiduciary, contractual or legal relationship between Foster and plaintiff. Foster did not seek to induce plaintiff to change from a monthly to an annual premium to be paid on the policy. For inducements and representations thereon, see *Winslow v. Burns,* 47 N.M. 29, 132 P.2d 1048 (1943). I can find nothing that the law requires to be done or forborne by Foster. Foster had no duty to advise plaintiff.

*Second,* Foster did not make a negligent misrepresentation. *Winslow, supra,* quoted two definitions of a representation:

"While in its strict sense, a 'representation' is an assertion or statement of some fact, it may also include an implied representation by conduct that a fact exists, including both express and implied statements, so that whatever word, action, or conduct conveys a real impression that a fact exists is embraced in the term. *Ricks v. State,* 8 Ga.App. 449, 69 S.E. 576, 577."

.    .    .    .    .

"The term 'representation' is used for convenience as including both express and implied statements. It is not necessary that there should be an express statement. Whatever word, action, or conduct conveys a clear impression as of a fact is embraced in the term. Indeed, the term 'representation' includes silence in certain cases; for silence, where one is bound to speak, is ordinarily equivalent to an admission of fact. *Foster v. McAles-*

*ter,* 3 Ind.T. 307, 58 S.W. 679, 684." [47 N.M. at 34, 132 P.2d at 1050.]

A misrepresentation is a false representation. To establish a misrepresentation, plaintiff would have to establish that Foster said to plaintiff, or by some word, action or conduct, conveyed to plaintiff the fact that the insurance policy allowed a pro rata refund of an annual premium, which representation would be false. Foster had no duty to speak and was silent on the subject of any refund. To say nothing cannot be transformed into a false representation.

Plaintiff's argument centers among those cases which establish a rule that if a misrepresentation has been made by the insurer or the insured, or by a party to a contract, and such misrepresentation is material to the contract, then it makes no difference whether the party acted fraudulently, negligently, or innocently. *Modisette v. Foundation Reserve Insurance Co.,* 77 N.M. 661, 427 P.2d 21 (1967); *Tsosie v. Foundation Reserve Insurance Company,* 77 N.M. 671, 427 P.2d 29 (1967); *Horger v. Mutual of Omaha Insurance Company,* 83 N.M. 596, 495 P.2d 376 (1972); *Ham v. Hart,* 58 N.M. 550, 273 P.2d 748 (1954), overruled in part by *Hockett v. Winks,* 82 N.M. 597, 485 P.2d 353 (1971); *Prudential Insurance Company of America v. Anaya,* 78 N.M. 101, 428 P.2d 640 (1967).

Plaintiff cannot pole vault to these cases without first making an argument that Foster made a negligent misrepresentation that induced her to change from a monthly to an annual premium. No such argument was made because no such evidence appears in the record. There is no genuine issue as to any material fact.

I conclude that the summary judgment in favor of Occidental should be reversed, and the summary judgment in favor of Foster should be affirmed.